UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KATHY BENSON,

        Plaintiff,

v.

        Case Number 06-13145-BC
        Honorable Thomas L. Ludington

CARSON CITY HOSPITAL,

        Defendant.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DISMISSING PLAINTIFF'S CLAIM OF A VIOLATION OF THE FMLA
BASED ON INTERFERENCE, AND DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

On July 10, 2006, Plaintiff Kathy Benson filed a complaint alleging violations by Defendant Carson City Hospital of Title VII of the Civil Rights Act of 1964, of the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*, and of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*. On June 22, 2007, Defendant filed a motion for summary judgment.

I.

Plaintiff worked as a licensed practical nurse for Defendant from 1987 until her termination on May 3, 2005. Prior to May 2005, according to Georgette Russell, Defendant's human resources director, Defendant had taken no written disciplinary action against Plaintiff over the 18 year span of her employment. During a probationary period in a new department from September to December 2004, her supervisor, Shelley Whitacre, included nothing negative in her reviews.

On December 23, 2004, a fellow nurse, Dan Mason, came in from outdoors and demonstrated the temperature by placing his hands under her scrubs, on her midriff, and then down her pants. Shortly

thereafter, other employees who witnessed the incident reported it to Nancy Weaver,[1] Defendant's director of nursing, and she related the information to the human resources director. On or about December 28, 2004, Plaintiff alleges that she contacted Defendant's nursing director to report the incident. On January 5, 2005, Plaintiff reported the incident to the police, who confirmed its occurrence with an eyewitness, Pauline Thompson-Weaver, as well as with Mason.

Mason acknowledged the facts as stated by Plaintiff to the police. He subsequently pleaded guilty to misdemeanor assault and battery. He learned that he was terminated when he reported to work and was met by the director of human resources and a police officer.[2]

In her answer to Defendant's first interrogatory, Plaintiff alleges that Defendant's supervisory personnel treated her differently after she made the police report. She states that, after an unsuccessful attempt at contact the previous day, on January 28, 2005, she contacted the human resources director to get the notes from a meeting attended by Plaintiff, the human resources director, and the nursing director. Plaintiff maintains that the human resources director indicated she would need to subpoena them. Plaintiff then met with Bill Fife, the vice president of operations for Defendant. She claims that she reiterated her request to him and that he responded by standing up, flailing his arms, and saying "Goddamn it I don't know."[3] Although he allegedly indicated that he would check with his attorneys,

---

[1] Plaintiff alleges that Weaver is somehow related to Mason. Defendant responds that Weaver's sister-in-law's granddaughter is Mason's wife.

[2] In footnote 4, on pp. 3-5 of her response brief, Plaintiff recites allegations of a history of inappropriate behavior by Mason. These allegations include his purported harassment of another nurse with whom he had allegedly previously had a romantic relationship, the institution of a "zero-tolerance" policy by Defendant regarding his conduct, but the total absence of any disciplinary action. Other allegations involve harassment and disrespect for a female doctor and antagonism of a patient and of a referring physician. Finally, Plaintiff maintains that certain of Defendant's supervisory personnel were Mason's relatives and that some of them had a familiar relationship with him through contacts at church or his daughter's babysitting activities.

[3] According to his deposition, he swore out of frustration, rather than at Plaintiff.

Plaintiff maintains that he did not follow up with her. She also asserts that he had previously greeted her regularly in a pleasant manner but that, after her police report, those conversations ceased. In his deposition, the vice president disagreed, maintaining that he continued to greet her if he saw her.

Plaintiff also claims that her supervisor was Mason's friend and that the supervisor, after she returned from her own leave, insisted on reviewing these issues. According to Plaintiff, her supervisor had an angry attitude during that discussion and then later accused Plaintiff of having "an attitude" when she declined to discuss the incidents further. Plaintiff states that her supervisor subjected her to microscopic scrutiny thereafter, assumed a negative demeanor toward Plaintiff that was a departure from previous interactions, and wrote up Plaintiff for absences that were excused under the FMLA. Plaintiff claims that her supervisor changed her job schedule and description and wrote her up for discipline, without informing her, for events that did not warrant discipline. Plaintiff states that her supervisor called her a "bitch" at their final meeting before the termination of her employment.

According to a February 2005 document drafted by Plaintiff's supervisor, staff alerted her to several issues she need to address with Plaintiff after the supervisor returned from leave. These issues included communication with other nurses, proper charting procedure, receptiveness to constructive criticism, lab work, and absences, among other things.

Also in February 2005, Plaintiff maintains that her experience of stress from work resulted in angina and anxiety disorders. She took FMLA leave for anxiety and chest pains, and the human resources director approved leave dates for February 13, 16, and 17, 2007.

Plaintiff's supervisor also documented complaints about (1) Plaintiff's attitude in March 2005; (2) her charting of patient conditions on March 28, 2005; (3) delay in assessing a patient with chest pain

on March 31, 2005; (4) an incomplete form[4] on April 11, 2005; (5) insufficient detail on forms on April 13, 2005; (6) incorrectly charted medications, as noted by a doctor, on April 19, 2005; (7) her failure to cooperate with delegated responsibilities on April 19, 2005; (8) disrupting a discharged patient's expression of gratitude with examples of less successful circumstances on April 23, 2005; and (9) informing a doctor of a complaint against him on April 24, 2005. Plaintiff states in her brief that she had never seen these write-ups. Both Plaintiff and her supervisor, however, agree that they discussed the content of them and that the supervisor took no formal action against Plaintiff for these events. Rather, the supervisor kept notes of her conversations with Plaintiff about these circumstances.

According to Plaintiff, her attitude toward working in her department became more negative in April 2005. She felt that her job description kept changing, and she did not appreciate sudden changes in her work schedule. She and a co-worker worked extensively to create a schedule that accommodated a variety of personal needs, only to have her supervisor require changes.

On May 3, 2005, the human resources director and Plaintiff's supervisor met with Plaintiff. They presented her with a written warning regarding the April 24, 2005 event where she informed a doctor of a complaint against him, as well as a verbal warning about the many performance issues identified against her over the recent months. According to Plaintiff, she inquired why they were revisiting issues previously discussed, to which her supervisor allegedly responded that Plaintiff was being defensive. The supervisor declined to identify those who had brought complaints, although Plaintiff requested more details. Plaintiff asserts that she felt overwhelmed in the meeting, having had a busy morning of patient care and still suffering from rib pain (from a fall for which she had an appointment later that day). She states that she felt exhausted and that her continued participation in

---

[4]Plaintiff maintains that two nurses told her to leave the form incomplete, but those nurses denied giving that direction.

the conversation was pointless, even after they arranged for the nursing director and another nurse, chosen by Plaintiff, to attend the meeting as well. Both Plaintiff's supervisor and the human resources director noticed that Plaintiff was shaking and almost crying. The supervisor indicated that they needed a commitment that Plaintiff would like to continue working in that department (or to consider another department), that she would not get defensive and would work with the staff productively. Specifically, the supervisor directed Plaintiff to provide her response by 9 a.m. the following morning. The meeting concluded because Plaintiff needed to go to her doctor's appointment and because continuation seemed futile, given Plaintiff's emotional state.

At her doctor's appointment, Plaintiff maintains that the focus was on her angina pains, rather than on her rib pain. The following morning, on May 4, 2005, Plaintiff called in sick, explaining that she had taken nitroglycerin for chest pain that she was experiencing. Defendant's representative advised that Plaintiff would need to submit FMLA paperwork. FMLA leave for May 3 and 4, 2005 was subsequently approved.

Later that morning, Plaintiff left a message for the nursing director expressing interest in learning more about other positions at the hospital. She then contacted her supervisor, and they discussed getting that information, concluding with an understanding that the supervisor would contact Plaintiff later that day with that information. They then traded phone calls before another conversation late in the afternoon. At that point, the supervisor insisted that Plaintiff come in the following day for a meeting, but Plaintiff refused because it was her previously scheduled day off. The supervisor indicated that Plaintiff would not be scheduled for work until the matter was resolved and offered to

meet with her on May 10, 2005.[5] According to the supervisor's notes of the conversation, Plaintiff again refused to come on that day, because her first day back to work would be May 11, 2005, so Plaintiff believed that May 10, 2005 was also a day off. After a follow-up conversation with the human resources director, the supervisor contacted Plaintiff again to insist that she attend the meeting the following day and to state that her job was at issue. Plaintiff assured her that she would not attend.

The following day, May 5, 2005, Plaintiff did not attend the meeting. The human resources director, after consultation with the supervisor and the nursing director, terminated Plaintiff's employment. The human resources director and the supervisor both testified that they did not reach the decision to terminate her employment before that day.

On July 10, 2006, Plaintiff filed a complaint, claiming retaliation under Title VII and ELCRA and under the FMLA. On June 22, 2007, Defendant filed a motion for summary judgment, and Plaintiff filed a motion for partial summary judgment, as to her FMLA claim.

II.

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole

---

[5] According to the supervisor's notes, she asked Plaintiff if she could record this conversation, to which Plaintiff responded with shock. Because of a tape recorder malfunction, the supervisor did not, in fact, record the conversation, and she so stated to Plaintiff.

could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

III.

A.

42 U.S.C. § 2000e-3(a) prohibits retaliation against employees who invoke rights under Title VII. The statute provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

*Id*. Courts employ the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to review a retaliation claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). To make out a *prima facie* case, a plaintiff must show that (1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to [the] defendant; (3) [the] defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Id*. (citations omitted). Regarding causation, "[t]o establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not

have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citations omitted).

Thereafter, the defendant may rebut the plaintiff's *prima facie* case by showing that a legitimate, non-discriminatory reason existed for the adverse employment action. *Morris*, 201 F.3d at 793. The plaintiff then must demonstrate that the proffered reason for that action was pretextual. *Id*.

Similar to Title VII, ELCRA bars an employer from "retaliat[ing] or discriminat[ing] against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich. Comp. Laws § 37.2701(a). A claim of unlawful retaliation requires a plaintiff to show "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Rymal v. Baergen*, 686 N.W.2d 241, 256 (Mich. Ct. App. 2004) (citation and internal quotation omitted). "Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation [for] discrimination-based retaliation . . . ." *West v. General Motors Corp.*, 665 N.W.2d 468, 473 (Mich. 2003) (citation omitted). Any meaningful difference between a claim of retaliation[6] under Title VII and under ELCRA, either as to the legal standards or as applied to these facts, has received no attention from the parties.

---

[6]Defendant advances an argument against any claim of hostile work environment sexual harassment. The Court's review of the complaint, and supported by Plaintiff's silence on the point in her response, suggests that she does not advance any such claim. The facts, as alleged, do not obviously support such a claim, and considering it appears to require improperly conflating the hostility that Plaintiff allegedly faced in her work environment with the fact that she experienced an incident of sexual harassment. Accordingly, the Court will not consider a claim not advanced, i.e., of hostile work environment sexual harassment.

Here, Defendant audaciously suggests that Plaintiff did not engage in protected activity. Defendant states that she had "nothing to do with . . . Mason's discharge other than being the victim." Dft. Br., p. 12 [dkt #14]. On the contrary, Plaintiff reported his conduct to the police and, arguably, to the nursing director (although Defendant does not concede that point). Even if a report to the police did not constitute making a charge *under Title VII* (or ELCRA), Plaintiff has alleged that she did report the incident to her superiors. That amounts to a protected act. Further , Plaintiff has made a showing that Defendant knew of that report, and Defendant's termination of her employment constitutes an adverse employment action.

The last element that Plaintiff must show for her Title VII and ELCRA retaliation claims is causation. Proximity in time alone does not suffice to demonstrate causation, and, more importantly, four months intervene between the protected activity and the adverse employment action. Plaintiff made her report in December 2004, and Defendant terminated her employment in May 2005. In those intervening months, however, Plaintiff notes several events that could support an inference of retaliation. These events include her supervisor's purported friendship with Mason, her supervisor's change in attitude toward her and increased scrutiny of her conduct, changes to her work schedule, her supervisor calling her a "bitch" at their final meeting, and a vice president swearing at Plaintiff. These events allegedly occurred within the four months after Plaintiff reported sexual harassment, after Plaintiff's eighteen years of service at Defendant without written discipline. Then, rather than employing Defendant's progressive disciplinary policy, the supervisor and the human resources director presented Plaintiff with her first formal discipline, a written warning and a verbal warning. Plaintiff left that meeting in apparent distress to go to a doctor's appointment, and she called in sick the following day. Her employment was terminated two days after those two warnings.

Defendant can marshal facts to suggest an alternate meaning of these events. For instance, Defendant might contend that the vice president swore in Plaintiff's presence but not at her, that increased scrutiny was warranted due to concerns about Plaintiff's job performance, and that Plaintiff's failure to appear at the meeting on May 5, 2007 was an act of insubordination. These differences, however, merely draw out the existence of genuine issues of material fact. Regardless of the contrast that Plaintiff attempts to draw with Defendant's alleged treatment of Mason, reasonable inferences could lead to the conclusion that Defendant's termination of Plaintiff's employment was in retaliation for her report of Mason's sexual harassment. Accordingly, Plaintiff has made out a *prima facie* case of retaliation under Title VII and ELCRA.

Defendant does offer a legitimate, non-discriminatory reason for terminating Plaintiff's employment. Defendant maintains that she was disruptive among her co-workers and with patients, and the litany of incidents noted by her supervisor supports that assertion. Plaintiff herself acknowledged that her supervisor discussed those events with her, although she maintains that she never saw her supervisor's written notes until near (or after) her termination date. The catalogue of Plaintiff's poor performance, largely generated during April 2005, would support a conclusion that business reasons, such as the protection of the hospital and its patients, required some intervention when a nurse was struggling to meet her job requirements. Additionally, Plaintiff's repeated refusals to come in for a meeting to discuss her commitment to her responsibility, even when an alternate date was proposed, support a conclusion that she was insubordinate. If true, that would provide Defendant with a legitimate, non-discriminatory reason for terminating her employment.

To claim that Defendant's reasons are pretextual, Plaintiff advances two arguments. First, she compares the apparently lax disciplinary treatment of Mason, who she maintains engaged in egregious

and offensive behavior regarding several women at the hospital, with her own summary dismissal. Second, she contends that the written warning she received, regarding alerting a doctor to a complaint against him, was based on a supposed policy that does not exist. Indeed, she had received no such warning for the prior 18 years of her employment there. Plaintiff's contentions do suffice to suggest the existence of a pretext in terminating her employment. Accordingly, genuine issues of material fact remain as to Plaintiff's Title VII and ELCRA retaliation claims, and Plaintiff's contentions regarding pretext prevent Defendant from showing its entitlement to judgment as a matter of law.

B.

Regarding Plaintiff's FMLA claim, the FMLA provides covered employees up to twelve workweeks of leave upon, among other things, the occurrence of "a serious health condition" rendering the employee unable "to perform the functions of the [her] position." 29 U.S.C. § 2612(a)(1)(A), (D). A serious health condition includes an "illness, injury, impairment, or physical or mental condition" that requires "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). To invoke FMLA leave, an employee need only giver her employer notice of her request for leave and state "a qualifying reason for the needed leave"; she need not expressly designate the leave as FMLA leave. 29 C.F.R. § 825.208(a)(2).

Upon return to work and before the expiration of the twelve workweek period, an employee must either be restored to her position or, if unavailable, an equivalent position. 29 U.S.C. § 2614(a)(1). Further, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" guaranteed by the FMLA, and may not discharge or discriminate in any way against an employee for opposing practices that are unlawful under the FMLA. 29 U.S.C. § 2615. An aggrieved employee may sue to enforce her FMLA rights on one of two theories: entitlement (or

interference) or retaliation (or discrimination) by an employer for resorting to leave granted by the FMLA. 29 U.S.C. § 2615(a).

To succeed on an FMLA interference claim, a plaintiff must demonstrate that (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). Because the entitlement is due if the statutory requirements are met, the employer's intent is irrelevant. *Arban v. West Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (citations omitted). Also, "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citations omitted).

A *prima facie* case of FMLA retaliation is established by providing evidence of the following three elements: (1) the plaintiff availed herself of a protected right under the FMLA, including notifying her employer of her intent to take leave; (2) she was adversely affected by an employment action; and (3) there was a causal connection between the exercise of the protected right and the adverse employment action. *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314 (6th Cir. 2001). FMLA retaliation claims, like their counterpart in Title VII discrimination cases, employ the familiar burden-shifting analysis of *McDonnell Douglas*. *Id.* at 315. Thus, once a plaintiff has adduced evidence sufficient to make out a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *Id.* Once the defendant has

done so, the burden again shifts to the plaintiff to demonstrate that that reason was a pretext for the improper reason behind the adverse employment decision. *Id*.

Although courts may not require an exhaustive and optimal decisional process by the defendant and must not micro-manage employers, if the plaintiff "produce[s] sufficient evidence to establish that [the defendant] failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the [defendant] in such a process cannot be said to be honestly held." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-808 (6th Cir. 1998). The Sixth Circuit requires employers to advance a rationale reasonably supported by particularized facts. *Id*. If an employer succeeds on this point, the employee then may offer evidence to refute the employer, thus describing, in slightly different terms, the now-familiar *McDonnell-Douglas* framework. *Id*. (citations omitted).

Regarding interference under the FMLA, Defendant asserts that no FMLA leave had been granted on May 4, 2005. Consequently, Defendant asserts that it could not have interfered with benefits to which Plaintiff was entitled. More importantly, Plaintiff's repeated refusals to come to the hospital, her insistence that her health was unrelated to her refusal because she believed she had a day off, and her further refusal to come to the hospital at some point in the future provide support for the conclusion that she engaged in insubordination. Plaintiff was told that her job was on the line and that she needed to come to a meeting. Further, her superiors provided unchallenged testimony that they did not decide to terminate her employment until the meeting on May 5, 2005. Thus, Defendant has shown that it terminated Plaintiff's employment for a reason unrelated to FMLA leave, in light of *Edgar*. Consequently, Defendant has shown an entitlement to judgment as a matter of law, and Plaintiff has

not identified any genuine issue of material fact that remains on this point. Thus, the Court will grant Defendant summary judgment regarding any claim of interference under the FMLA.

Correspondingly, the Court will deny Plaintiff's motion for partial summary judgment on this single claim. She makes no showing that she was denied a right to which she was entitled under the FMLA. She has offered no evidence that she was denied FMLA leave on May 5, 2005 or that she was denied reinstatement to her position upon her return. No evidence suggests that she sought reinstatement to her former position. Nor has Plaintiff overcome Defendant's factually uncontested assertion that it had a reason unrelated to any FMLA for terminating her employment.

Regarding a retaliation claim under the FMLA, Plaintiff has likely established the first two elements – an intent to take leave and an adverse employment action. The element of causation, however, involves genuine issues of material fact. At a minimum, the temporal proximity raises an inference in favor of Plaintiff, whose termination occurred the day after she took leave under the FMLA. The depositions of her superiors, however, suggest that her termination followed from her refusal to attend a meeting, or even a meeting on an alternate date, to review her employment situation. Additionally, Defendant can offer the same legitimate, non-discriminatory reason of her alleged poor performance, as outlined above, as its basis for terminating her employment. Yet, as with the Title VII/ELCRA claim, Plaintiff can offer evidence that that reason was pretextual. Consequently, neither party has established entitlement to judgment as a matter of law, given contested issues of fact and the absence of evidence or argument on elements of these claims. Thus, the Court will deny Defendant's motion for summary judgment as to a claim of retaliation for exercising FMLA rights.

IV.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [dkt #14] is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's claim of a violation of the FMLA, to the extent that she relies on a theory of interference, is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiff's motion for partial summary judgment [dkt #15] is **DENIED**.

                      s/Thomas L. Ludington
                      THOMAS L. LUDINGTON
                      United States District Judge

Dated: October 9, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 9, 2007.

                s/Tracy A. Jacobs
                TRACY A. JACOBS